Green, J.
delivered the opinion of the court.
This bill is filed to have an account, and recover compensation from the corporation of Nashville, for a number of pipes and other castings delivered by the complainant to the corporation, for the water works of said town.
The contract between the parties, is contained in a proposition submitted by the corporation to Joseph Anderson & Co., of which firm complainant was a member, and their letter of acceptance of the terms proposed.
The proposition, after describing the dimensions of the castings, proceeds as follows: “The pipes, branches and circular pipes must be in size and form agreeable to the annexed drawings, signed by the parties, of good metal, which will not crack by handling, and which can' be easily drilled. The outside, and particularly the inside of the pipes must be smooth without projections <Jr cavities, and no pipe will be *297 received which has projections in .the inside, or which will . i. r . , , . ’ not allow a iree and easy passage through the pipe from one end to the other, of a circular piece of iron equal in diameter to the bore of the pipe. The pipes, branches, and other castings, are to be proved in presence of the watering committee, or their agent, by means of a hydraulic press, or water pressure pump of Bramah, under a pressure equal to a column of water of three hundred feet in height, and at the expense of the contractor, who has to erect a pressure pump at the furnace. The watering committee, or the agent, will attend to the proving of the pipes and other castings, as soon as there are sufficient numbers cast, and mark the pipes and other castings which stood the proof, and were found, after a careful examination, without any defects.
“The contractor must find the patterns, which must be approved by the watering committee, or their agent; the pipes and other castings will be received free of expense, at the Broad Street wharf, if they arrive in boats, or if brought in wagons, at the place of deposite pointed out by the watering committee, or their agent.
“The watering committee or their agent shall be at liberty to reject all the pipes- and other castings at the arrival in the city, which they find defective, although they had previously been marked at the furnace. The pipes and other castings shall not be unloaded, without giving previous notice to the watering committee or their agent.
“The number and size of the pipes, branches and other castings above stated, shall not be binding on the watering committee, and they shall be at liberty to vary the number and size at pleasure.
“In case the pipes and other castings should not be delivered at the above stipulated time, the watering committee shall be at liberty to purchase the pipes and other castings neces-' sary for the Nashville water works, as above stated, at the cost and expense of the contractor, at any place where they may think proper. The payments to be made thirty days after the delivery of each parcel of pipes and other castings as ahove stated. The proposals to state the price per pound *298 for pipes, branches, and other castings, delivered free of ex*' r r. , . ,. >T t -n pense m the city oí JNasimile*
“F. Porterfield, Chairm an
‘Nashville, 4th Jan. 1831.”
To this proposition, Joseph & answer, that they would deliver in the city of Nashville the cast iron pipes, branches and other castings necessary for the water works, agreeable to the above proposition, at two and a fourth cents per pound, and strictly attend to the conditions contained in said proposition. Under the above contract a considerable number of pipes and other castings were delivered in Nashville, and taken into the possession of the watering committee. The test of the pressure pump was applied to all the pipes thus delivered, at the furnace, and having stood the proof, they were marked by the agent of the watering committee. When the engineer was about to lay these pipes down, in the construction of the water works, he applied the further test of striking the pipes with a hammer, which disclosed blisters and other defects in many of them, which rendered them unfit for the use for which they were intended, and they were rejected. The complainant and Mr. Steine, the engineer, differing as to the application of the hammer, as a test of the pipes, and as to the right of the watering committee to reject them, after they had been received in Nashville, the contract was abandoned, and complainant refused to deliver the remainder of the pipes. In consequence of this failure on part of the complainant, to comply with the contract of Joseph Anderson & Co,, the corporation were compelled, in obtaining from others the pipes necessary to finish the water works, to give three and one half cents per pound, and were subjected to considerable loss by reason of the delay, consequent upon such non-fulfilment.
Steele, the complainant, is entitled to the benefit of the contract of Joseph Anderson & Co., and insists in his bill that he is entitled to the full value of all the castings that were delivered in Nashville, regarding them all as being of good quality, they having stood the proof stipulated in the contract.
It is insisted for the defendant, that the court of chancery *299 lias no jurisdiction of the case, and if it has, that Steele is entitled only to pay for such pipes as stood the final of the hammer, and is liable for the excess of price the corporation paid to others, and for damages consequent upon the delay he produced, by reason of the non-delivery of the pipes in due time.
1. The first question to be considered, arises upon the construction of this contract. X)id the pipes become the property of the corporation so soon as they were delivered in Nashville? and had its agent a right, under the contract, to apply the test of the hammer, and reject the pipes, when about to lay them down ?
The contract stipulates, that the pipes are to be proved by means of a hydraulic press, under a pressure equal to a column of water three hundred feet in height. If they stood this proof, and were found after a careful' examination without any defects, they were to be marked by the'agent of the watering committee, and transported to Nashville by the contractor; and were to be received by the watering committee at the Broad street wharf, if they were conveyed in boats, and if brought in wagons, at the place of deposite to be pointed out by the watering committee.
The pipes were not to be unloaded without giving previous notice to the watering committee or their agent, and they were at liberty to reject all the pipes at their arrival in the city, which were found defective, although they had been previously marked at the furnace. The payments were to be made in thirty days after the delivery of each parcel of pipes.
Taking all these stipulations into view, it seems clear that the parties contemplated no additional and severer test of the pipes than that stipulated in the contract, and that when the pipes were received in the city, they became the property of the corporation of Nashville.
This view of the contract will manifestly appear from the following considerations.
1. In the first place, it is unreasonable to suppose that parties who stipulated specially for a particular method of proving the article, which is the subject of contract, should *300 contemplate another, and a severer test, which is not men-If such were the intention, why stipulate for any test whatever? It would have been enough to have stipulated f°r a g°°d article, with the right of rejecting such as were defective. This would have been subject to no misconstruction, and could had misled neither party. But the stipulation in the contract, that the pipes should be subject to a particular test, or mode of proof, is an exclusion of all other ¡modes. It authorises the manufacturer to insist upon the reception of such an article, as will stand the proof agreed upon. He may have been willing to receive a price, which would by no means have been adequate for an article of the best quality, capable of standing the severest proofs.
2. All the pipes that stood the proof, were to be delivered by the contractor in Nashville. The delivery of these pipes in Nashville, was a heavy expense to the contractor. If it had been contemplated by the parties, that they were to be subjected to another proof, much more severe than the pressure of the water, is it not reasonable to suppose that test would have been applied at the furnace? In the nature pf things, it must have been known to the engineer who wrote this contract, that many of the pipes which would stand the water, would not stand the hammer. If the hammer had been applied at the furnace, the rejected pipes could have been turned to some account by the contractor, but rejecting them at Nashville, in addition to the heavy expense of their transportation there, he was enabled to get less for them than one cent per pound. It is unreasonable to suppose the parties contemplated such a result.
3. The pipes were to be received at the wharf, if conveyed in boats, and if conveyed in wagons, at such place as should be pointed out by the agent of the watering committee, and in either case, the committee were to be notified of their arrival previously to their being unloaded. This is an express agreement to receive them when they arrive in Nashville. They were to be received as the property of the corporation, and as they ceased to be in the possession, or under the control of Steel, so his ownership of them ceased. The notice that the watering committee, or their agent, was *301 to receive, evinces that such was the understanding of the parties. They were at liberty to reject any of the pipes on their arrival at the city, that should be found defective. If they were to receive them at the wharfj it was indispensable that they should have notice of their arrival, in order that they might exercise the privilege of rejecting such as were found defective. Hence this stipulation for notice, and for the particular provision that it should be given before the castings should be unloaded.
4. The payments were to be made in thirty days after the delivery of each parcel of pipes. This is an auxiliary circumstance to show, that the question of ownership was to be ■promptly determined, for if it were not known what pipes were received, and what rejected, within the thirty days, it would be impossible to make the payments.
5. But it is asked, why stipulate for the right to reject defective pipes, if they were to undergo no additional proof? The reason for this stipulation is most apparent upon the face of the contract, and is fully explained by Mr. Steine, the engineer, in his deposition, which the defendant has read in evidence. He says, “that he knew from long experience that sometimes it is difficult to find out blisters in pipes, and cracks at the small end, which defects are very often revealed by transportation.” And he'further says, that it was to guard against any injury the pipes might receive in the transportation of them from the furnace to Nashville, and any imposition that might be practiced in sending to Nashville pipes that had been rejected at the furnace, that the provision was introduced into the contract, that defective pipes might be rejected at their arrival at the city.
This explanation of the contract accords with the^. plain sense of the language the parties have used. Until the pipes were delivered in Nashville, they were to be in possession of the contractor; they might be injured by transportation; latent defects might be revealed, or imposition might be practiced; and hence the good sense of stipulating for a right to reject at Nashville. But none of these considerations contemplate any further and severer test. It is absurd to say, that the right to reject was reserved, because latent defects *302 would be revealed by transportation, and at the sanie time . , ... contend, that the privilege existed to prove them with the hammer. If they were to be thus proved, it is manifest the defects which transportation would reveal, would be much more plainly revealed by the blows of the hammer. But if it were reasonable that the pipes should be at the risk of Steele so long as he had possession of them, it was equally reasonable that after he ceased to have any power over them, they should be at the risk of the defendant.
With these views, we think the watering committee had no right by the contract to reject any of the pipes after they had been received by them, or to refuse payment for them according to the terms of the contract, although upon the application of the proof of the hammer, they were found defective.
The next question is, whether the complainant is entitled to relief, and to what extent. The course which was pursued by the defendant in this case, having been in violation of the contract, and it having become manifest, by withholding the payments which by the contract they were bound to make, that if the complainant were to go on with the fulfilment of the stipulations on bis part, he must not only be subjected to great delay in receiving payment, but that he would be involved in a doubtful and protracted litigation, it was the part of prudence in him to put an end to the contract. A court of equity will not require that a party to a contract shall go on, after it has been violated by the other party, in a ruinous fulfilment of it, on his part, in order that he may be enabled to prosecute an action at law, but will afford him such relief as to right and justice may belong.
In' this view of the case there is no difficulty in maintaining the jurisdiction of the court. It is in fact the only forum in which he can obtain adequate relief, if he could obtain relief at all, in u court at law. Had he gone on to deliver all the castings, according to the contract, he might then have recovered at law the full price stipulated, but. not having done so, and coming into this court to put an end to the contract, and move the conscience of the chancellor in his favor, he *303 Can obtain so much onh, as in conscience be ought to J 1 , ° receive. . _ _
. The castings were for a particular purpose, and many oí them were wholly unfit for that purpose. The method of proving the pipes agreed on in. the contract, has nothing to do with the question of compensation in this court. It is preposterous for the complainant to come into this court, to be relieved from a technical objection to his recovery, and at the same time insist on his right to recover upon a technical stipulation in the contract, that'which in conscience he has no right to receive. He can get here only the real value of the articles he delivered. Those that were rejected were unfit for the water works. The complainant has sold them, and we are bound to suppose he sold them for their full value. He is only entitled, therefore, to the value of those that were actually used at the price stipulated in the contract.- For such only he may have an account and decree.
The defendants insist that they ought to be allowed damages, for the difference in price they gave other contractors, and the price they were to pay complainant. To this they are not entitled, if the corporation violated the contract, and justified the complainant in the eye of a court of equity, to put an end to it, it follows that they are entitled to claim nothing from the complainant for his non-fulfilment of it. Neither party will recover costs.
Decree reversed.